IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:24-CR-79-KAC-JEM |
| | ) | |
| CORNELIUS BARNES, JR., and | ) | |
| MICHAEL MAHONE, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. *See* 28 U.S.C. § 636(b). This case is before the undersigned on Defendant Cornelius Barnes's Motion and Memorandum to Suppress Evidence Seized at 5101 Asheville Highway, Unit 101, Knoxville, Tennessee [Doc. 56] and Defendant Michael Mahone's Motion to Adopt Motion to Suppress Evidence Seized at 5101 Asheville Highway Unit 101 [Doc. 59]. Defendants ask the Court to suppress evidence seized during the execution of a search warrant at the apartment, arguing the affidavit in support of the search warrant lacks probable cause for its issuance [Doc. 56 p. 1].

The Indictment charges Defendants Barnes and Mahone with conspiring with each other and unnamed others to distribute fifty grams or more of methamphetamine (Count One) and four hundred grams or more of a mixture containing fentanyl (Count Two) between June 7 and July 12, 2024 [Doc. 13 pp. 1–2]. Both Defendants also allegedly possessed fifty grams or more of methamphetamine (Count Three) and four hundred grams or more of a mixture containing fentanyl (Count Four) with intent to distribute on July 12, 2024 [*Id.* at 2]. The Indictment also alleges Defendants possessed firearms in furtherance of drug trafficking (Count Five) and contends that

Defendant Barnes, a convicted felon, possessed a firearm (Count Six), both allegedly occurring on July 12, 2024 [*Id.* at 2–3]. These charges arise in part from the execution of a search warrant at an apartment[1] at the Holston Place Apartments in Knoxville, Tennessee, on July 12, 2024.

Defendants move to suppress all evidence seized from the apartment, arguing the search violated their rights under the Fourth Amendment [Doc. 56 p. 1]. Defendants contend that the supporting affidavit fails to provide probable cause to issue the search warrant because it does not show a nexus between the apartment and drug trafficking, and contains stale information [*Id.* at 1, 5–8]. They deny that the executing officers relied on the search warrant in good faith because the supporting affidavit contains not even a modicum of evidence supporting a nexus [Doc. 65 pp. 3–6].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds Defendants have standing to challenge the search of the apartment, Detective Strickenberger's affidavit provides a nexus between the apartment and drug trafficking, and the information in the affidavit was not stale. Even if probable cause were lacking, the undersigned finds the officers executed the search warrant in good faith. The undersigned therefore recommends that the District Judge **GRANT** Defendant Mahone's motion to adopt the suppression motion and **DENY** the motion to suppress.

I.     **BACKGROUND AND EVIDENCE**

Knoxville Police Department ("KPD") Detective Todd Strickenberger submitted an affidavit in support of an application for a search warrant for unit 1 at the Holston Place Apartments, at 5101 Asheville Highway, in Knoxville, Tennessee ("the apartment") [Doc. 58-1].

---

[1]     Defendants state the apartment number is 101 in their filings [Docs. 56 & 59]. The affidavit in support of the search warrant states the apartment number is 1 [Doc. 58-1 p. 1]. The undersigned refers to the apartment that is the subject of the search warrant as unit 1.

2

In his affidavit, Detective Strickenberger states that Cornelius Barnes occupies or controls the apartment [*id.* at 1] and that probable cause exists to believe that the apartment contains evidence, fruits, and instrumentalities of drug trafficking and possession of controlled substances and drug paraphernalia [*id.* at 3].

Detective Strickenberger states that on April 24, 2024, he and officers in the KPD Organized Crime Unit ("OCU") used a confidential informant to conduct a controlled purchase of a quantity of "heroin/opiate" from an individual identified as Khalid Sullivan [*Id.* ¶ 3].[2] Officers surveilling the controlled buy saw Sullivan driving a white Dodge Durango with a Texas license tag [*Id.*]. Through "law enforcement databases," officers determined that the Dodge Durango, which was a rental vehicle, was parked in the parking lot of the Holston Place Apartments on May 5, 2024 [*Id.*]. While conducting surveillance at the Holston Place Apartments on June 6, 2024, Detective Strickenberger saw Sullivan driving a silver Chevrolet Impala with tinted windows and a temporary license tag [*Id.*]. Officers confirmed that the Impala was registered to Sullivan [*Id.*]. Detective Strickenberger believed that Sullivan borrowed the Durango from a friend or neighbor on April 24, 2024, because he owned the Impala [*Id.*]. Detective Strickenberger related that on May 8, 2024, he observed that the Durango was no longer in the parking lot of the Holston Place Apartments and, instead, he saw another rental vehicle, which was a silver Toyota 4Runner with an Ohio license tag [*Id.*]. Approximately one-month later, on June 6, 2024, Detective Strickenberger saw that the 4Runner was replaced with another rental vehicle, a white Dodge Hornet with a Pennsylvania license tag [*Id.*]. Detective Strickenberger states that based upon his training and experience, he knows that drug traffickers commonly use rental vehicles, which they

---

[2] The "probable cause" portion of Detective Strickenberger's affidavit contains numbered paragraphs, while the paragraphs in the rest of the affidavit are not numbered [*See* Doc. 58-1]. The undersigned will cite to paragraphs when possible.

replace often to "thwart law enforcement detection" [*Id*.]. He says that law enforcement then began surveilling the apartment complex to determine who besides Sullivan used the rental vehicles [*Id*.].

Detective Strickenberger states that on June 7, 2024, he and officers from the KPD OCU and other agencies surveilled the Holston Place Apartments to determine whether the apartment was "a base of operations" for drug trafficking [*Id*. ¶ 4]. Officers observed two black males, Suspect 1 and Suspect 2, leave the apartment [*Id*.]. Suspect 1 entered the white Dodge Hornet rental vehicle [*Id*.]. Suspect 2 opened the driver's door on a black Jeep Cherokee with a Tennessee license tag [*Id*.]. Suspect 1 left the parking lot in the Dodge Hornet, and Suspect 2 returned to the apartment [*Id*.]. Detective Strickenberger states that a short time later, surveilling officers observed the Dodge Hornet in the Kroger parking lot at 4414 Asheville Highway and, based upon their training and experience, saw an "obvious hand-to-hand drug transaction" between the Dodge Hornet and the driver of a Nissan Rogue [*Id*.]. The Dodge Hornet immediately returned to the Holston Place Apartments, and Suspect 1 returned to the apartment [*Id*.]. According to Detective Strickenberger, Suspect 1 left the apartment again, entered the Dodge Hornet, and left the apartment complex [*Id*.]. Surveilling officers observed the Dodge Hornet make many unnecessary turns and take circuitous routes, which was consistent with an individual attempting to evade surveillance [*Id*.].

Detective Strickenberger maintains that after Suspect 1 left the apartment the second time on June 7, 2025, Suspect 2 left the apartment on foot and conducted two brief hand-to-hand drug transactions with other pedestrians [*Id*.]. After each transaction, Suspect 2 returned to the apartment, which indicated to Detective Strickenberger that Suspect 2 was "resupplying" [*Id*.]. Suspect 2 left the apartment on foot a third time and subsequently entered a white Honda Civic [*Id*.]. Surveilling officers followed the Civic one-half mile to a Circle K gas station on Asheville

4

Highway [*Id.*]. Suspect 1, driving the Dodge Hornet, met Suspect 2 at the Circle K, and Suspect 2 returned to the apartment with Suspect 1 without entering the Circle K convenience store [*Id.*]. Detective Strickenberger opines, based upon his training and experience, that Suspect 2 met with the occupants of the Civic to conduct a drug transaction due to Suspect 2's short time in the Civic and because Suspect 2 walked farther to meet the Civic than the distance to the Circle K [*Id.*].

Detective Strickenberger says he noticed there were two new rental vehicles, a black Chrysler Pacifica van with a Texas license tag and a black Chevrolet Impala with an Indiana license tag, in the typical parking spaces used by Suspect 1 and Suspect 2 on July 1, 2024 [*Id.* ¶ 5]. Using a law enforcement database, Detective Strickenberger was able to determine the white Dodge Hornet was still in Detroit, Michigan, and determined that the two new rental vehicles had replaced it [*Id.*]. Surveilling officers observed Suspect 1 enter and exit the black Chevrolet Impala, and Suspect 2 enter and exit the black Chrysler Pacifica.

Detective Strickenberger states that on July 2, 2024, detectives with OCU and other agencies conducted surveillance on Holston Place Apartments, as well as on the black Chevrolet Impala and the black Chrysler Pacifica [*Id.* ¶ 6]. During the operation, officers observed Suspect 2 leave the apartments in the black Chrysler Pacifica, pick up an unknown female, and drive her directly across the street to the Kroger located at 4414 Asheville Highway [*Id.*]. The unknown female exited the black Chrysler Pacifica and walked directly to the women's restroom [*Id.*]. The unknown female was not observed to make any purchases while inside [*Id.*]. After a brief interaction with the unknown female, Suspect 2 returned directly back to Holston Place Apartments [*Id.*]. Detective Strickenberger contends, based on his training and experience, that this type of behavior exhibited by the unknown female and Suspect 2 is indicative of drug

trafficking, and further shows that Suspect 2 was consistently leaving and returning to the apartments to resupply, proving that illegal substances are stored there [*Id.*].

During the same surveillance operation on July 2, 2024, officers observed Suspect 1 leave the apartments in the black Chevrolet Impala and conduct a hand-to-hand transaction with a male in a black SUV in the parking lot of the Kroger located at 4414 Asheville Highway [*Id.* ¶ 7]. Immediately after the interaction, Suspect 1 returned to the apartments [*Id.*]. After Suspect 1 had left, an officer approached the individual in the black SUV in the parking lot of the Kroger and observed in plain view what the officer knew to be from training and experience to be a small amount of heroin [*Id.*]. The officer subsequently learned that the individual had an outstanding warrant and took him into custody [*Id.*]. Further inspection revealed that the recovered substance did appear to be a heroin/opiate narcotic [*Id.*]. After the individual was taken into custody and questioned about their interaction with Suspect 1, the individual admitted they had purchased one gram of suspected heroin/opiate from the black man driving the black Chevrolet Impala, and that the only person with whom they had interacted in the Kroger parking lot that day was Suspect 1 [*Id.*]. The individual further stated they had purchased approximately one gram of suspected heroin/opiate at least one to two times per day from numerous individuals that use one telephone number for the last six months, with most if not all the drug purchases conducted in the area of Asheville Highway, which is in close proximity to the apartments [*Id.*]. The individual further represented that the dealers usually drove rental vehicles [*Id.*].

On July 5, 2024, Detective Strickenberger learned that the Knox County Sheriff's Office Narcotic Unit conducted a traffic stop on the white Dodge Hornet on January 10, 2024, and that the operator of that vehicle was identified as Cornelius Barnes [*Id.* ¶ 8]. After reviewing surveillance videos compiled from June 7, July 1, and July 2, 2024, Detective Strickenberger

6

determined that Suspect 2 was likely Cornelius Barnes [*Id.*]. During the traffic stop, Defendant Barnes was found in possession of a large sum of currency and could not explain how he acquired it [*Id.*]. Defendant Barnes told the officers that he was on his way back to Detroit, Michigan [*Id.*].

On the evening of July 5, 2024, Detective Strickenberger learned that the black Chevrolet Impala and the black Chrysler Pacifica were both in Detroit, Michigan [*Id.* ¶ 9]. He believed that because the vehicles were now in Detroit, it was likely that Defendant Barnes and Suspect 1 were also in Detroit, and that the apartment was vacant [*Id.*]. Before pursuing any further action on the apartment, law enforcement decided to wait until either of the vehicles returned to Knoxville [*Id.*]. On the night of July 6, 2024, Detective Strickenberger conducted hours of surveillance on Holston Place Apartments but observed no activity [*Id.*].

The morning of July 11, 2024, Detective Strickenberger discovered through law enforcement databases that the black Chrysler Pacifica had returned to the Knoxville area on July 10, 2024 and was parked in the parking lot of Holston Place Apartments [*Id.* ¶ 10]. That day, Detective Strickenberger and other law enforcement officers conducted a surveillance operation, during which they observed Defendant Barnes and Suspect 1 exit the black Chrysler Pacifica and enter the apartment [*Id.* ¶ 11]. Moments later, the surveillance units observed Suspect 1 leave the apartment and drive away in the black Chrysler Pacifica, and return to the apartment within a few minutes in the same vehicle [*Id.*]. A short time later, Suspect 1 again left the apartments in the black Chrysler Pacifica [*Id.*]. Officers were able to maintain constant surveillance on the vehicle as it traveled around Knoxville taking numerous unnecessary turns and circuitous routes, which is consistent with an effort to elude law enforcement detection and employ counter surveillance [*Id.*]. Detective Strickenberger stated that Suspect 1 also engaged in a "heat run," which is taking routes to confuse or throw off law enforcement surveillance, on July 7, 2024 [*Id.*]. Suspect 1 took at least

7

three heat runs on July 11, 2024 [*Id.*]. One heat run involved Suspect 1 exiting the interstate, driving through a business parking lot without stopping or patronizing the business, and then again entering the interstate and continuing in the original direction [*Id.*]. Suspect 1 also arrived at a Waffle House on 6230 Papermill Road and entered the business for a short time, not long enough to order and eat a meal [*Id.*]. Detective Strickenberger noted that Suspect 1 passed a Waffle House less than one mile away from the apartment on his way to the Waffle House on Papermill [*Id.*].

Based upon this investigation, Detective Strickenberger knows that members of this drug trafficking organization commonly conduct drug transactions from their vehicles while in the parking lots of restaurants and other businesses [*Id.*]. After Suspect 1 left the Waffle House, surveilling officers observed a brown pickup truck with three other occupants back in next to Suspect 1 as he sat in the black Chrysler Pacifica in the Waffle House parking lot [*Id.*]. Suspect 1 then opened his door and engaged in "a short, very brief interaction" with the driver of the brown pickup truck, concluding within seconds [*Id.*]. From his position, the surveilling officer did not observe a hand-to-hand transaction but, based upon his training and experience and consistent with the prior drug transactions by this drug trafficking organization, the surveilling officer thought it more likely than not that the two engaged in a drug transaction [*Id.*]. The brown pickup truck immediately left the parking lot, pulled into an adjacent hotel parking lot for approximately one minute, and then left again [*Id.*]. Detective Strickenberger knows from training and experience that drug customers commonly use the drugs they just purchased immediately or will stow or hide recently purchased contraband from law enforcement [*Id.*]. Surveilling officers also observed Suspect 1 immediately leave the restaurant parking lot and drive directly back to the apartment [*Id.*].

During the aforementioned surveillance operation, law enforcement stopped the brown pickup truck and questioned the three occupants about the location from which they came [*Id.* ¶ 12]. While the occupants had similar stories, all omitted being in the parking lot of the Waffle House or interacting with Suspect 1 [*Id.*]. The driver consented to a search of the vehicle, but officers found no contraband [*Id.*]. The affiant states, however, that the female occupant was not searched beyond a *Terry* pat down for weapons and could have hidden narcotics on her person [*Id.*]. Two of the three occupants had prior drug convictions or activity involving drug sales and personal use [*Id.* ¶ 13].

Based upon the affidavit of Detective Strickenberger, Knox County Criminal Court Judge Hector Sanchez issued a search warrant for unit 1 of the Holston Place Apartments at 5101 Ashville Highway [Doc. 58-1 pp. 9, 13]. On July 12, 2024, law enforcement executed the search warrant at unit 1 and seized "[a]pproximately 750 grams of crystal-like substance that field tested positive for methamphetamine, approximately 474 grams of a tan compressed powder that field tested positive for fentanyl, two loaded handguns (one of which was previously reported stolen), $5,047 [in] U.S. currency, six cellular telephones, and various items used to manufacture and distribute narcotics, including plastic baggies, a kilogram press, electronic sales, and cutting agents commonly used to dilute narcotics" [Doc. 1 ¶¶ 4–5, Affidavit Supporting Criminal Complaint].

On March 20, 2025, Defendant Barnes filed a suppression motion, arguing that the affidavit in support of the search warrant did not establish probable cause because it fails to show a nexus between the criminal conduct alleged and the place to be searched and because the information provided in the affidavit was stale [Doc. 56 p. 1]. Defendant submitted a copy of Detective Strickenberger's affidavit, the search warrant, and the return as a supplement to his motion [Doc. 58-1]. Codefendant Michael Mahone moved to adopt the suppression motion, arguing that

the motion to suppress "addresses issues germane to the charges against him and the interests of judicial economy and the need to avoid duplicative pleadings would be best served by permitting adoption of the motion" [Doc. 59 p. 1].

The Government responded in opposition to the suppression motion [Doc. 62], also attaching a copy of the affidavit for the search warrant [Doc. 62-1]. It argues that the affidavit establishes a sufficient nexus between the apartment and evidence of drug trafficking, the information in the warrant is not stale, and even if probable cause is lacking, the officers executed the search warrant in good faith [Doc. 62 pp. 6, 10, 13].

In reply, Defendants argue that the good faith exception to the exclusionary rule is not applicable, because the affidavit failed to establish a minimally sufficient nexus between the illegal activity and the place to be searched [Doc. 65 p. 6].

The parties appeared before the undersigned on July 11, 2025, for a motion hearing. Assistant United States Attorney Caroline Poore appeared on behalf of the Government. Attorney Robert Kurtz represented Defendant Barnes, and Attorney Ashlee Mathis represented Defendant Mahone. Both Defendants were also present.

Following the hearing, the undersigned took the matter under advisement.

## II.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. A search warrant for a residence must be based upon probable cause and must state the items to be seized with particularity. *Id.*; *Collins v. Virginia*, 584 U.S. 586, 593 (2018) ("At the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (citations omitted & cleaned up)). Probable cause "requires only a probability or substantial chance of criminal activity, not an

10

actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). "[P]robable cause is a flexible, common[-]sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief[] supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances related in the affidavit. *Gates*, 462 U.S. at 238.

An issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id.* "The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. In reviewing the sufficiency of probable cause for a search warrant, the Court considers only the information that was before the issuing judge—that is, the information contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

Defendant Barnes argues the search of the apartment violates his rights under the Fourth Amendment because the affidavit does not provide probable cause for the search warrant [Doc. 56 p. 1]. Specifically, he contends probable cause is lacking because (1) the affidavit does not provide a nexus between the apartment and drug trafficking and (2) the information in the affidavit is stale

[*Id*.]. Defendant Mahone joins in these arguments asserting he was an overnight guest at the apartment and, thus, Defendant Barnes's arguments apply equally to him [Doc. 59 p. 1].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds Defendants have standing to challenge the search of the apartment, Detective Strickenberger's affidavit provides a nexus between the apartment and drug trafficking, and the information in the affidavit was not stale. Even if probable cause were lacking, the undersigned finds the officers executed the search warrant in good faith.

### A.      Standing

A claimant alleging a Fourth Amendment violation must have a legitimate expectation of privacy in the place searched or the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "[S]tanding is 'an element' of a Fourth Amendment suppression claim[,]" and the person raising the Fourth Amendment challenge shoulders the "burden" of demonstrating his or her standing. *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id*. at 374.

A defendant must show that the search of the challenged place infringed upon his personal rights or legitimate expectation of privacy. *Id*. at 375; *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (holding a defendant challenging a search has the burden of demonstrating his or her legitimate expectation of privacy in the location). In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> the person's proprietary or possessory interest in the place to be searched or item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free

> from governmental intrusion; and whether he was legitimately on
> the premises.

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)) (alteration in original). An overnight social guest "has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minnesota v. Oleson*, 495 U.S. 91, 96-97 (1990)). In determining whether an overnight guest has a legitimate expectation of privacy in the host's home, the Court examines a relationship with the homeowner or lessee and other indicia of "acceptance into the household," such as having a key. *United States v. Heath*, 259 F.3d 522, 532–33 (6th Cir. 2001) (internal quotation omitted).

While the parties focus little attention on the issue, the record before the undersigned reflects that Defendants have standing to challenge the search. In the affidavit, the affiant identifies Defendant Barnes as occupying or controlling the apartment [Doc. 58-1 p. 1]. Defendant Mahone is not identified in the affidavit, and he asserts that he was an overnight guest at the apartment [Doc. 59 p. 1]. The affiant states that Suspect 1, who is not identified, and Suspect 2, whom officers later identified as Barnes, were seen coming and going from the apartment on at least four dates between June 7 and July 11, 2024 [*Id.* ¶¶ 4, 6, 8, 11]. The affiant relates that each of the suspects entered the apartment separately from the other [*Id.*]. This information shows that the suspects had access to the apartment and could each freely come and go. Additionally, the affiant states the suspects were believed to be in Detroit, Michigan, on July 5 and 6, 2024, because law enforcement databases showed the rental vehicles the suspects were observed using were in Detroit and surveilling officers observed no activity at the apartment on the night of July 6 [*Id.* ¶ 9]. According to the affiant, law enforcement databases showed that one of the rental vehicles, a Chrysler Pacifica, returned from Detroit to Knoxville on July 10, and an officer saw the Pacifica parked in

13

the parking lot of the apartment on the morning of July 11 [*Id*. ¶ 10]. The affiant states that on July 11, surveilling officers saw both suspects exit the Pacifica and enter the apartment, and later saw Suspect 1 leave the apartment, enter the Pacifica, and drive via a circuitous route to the Waffle House [*Id*. ¶ 11]. This information on the suspects' return from Detroit to the apartment is circumstantial evidence that the suspects spent the night at the apartment. Defendant Barnes filed the affidavit for the search warrant and the search warrant return as an exhibit to his motion [Doc. 58-1]. The attached Property Inventory Report lists the apartment as the address for both Barnes and Mahone [*Id*. at 16]. The Property Inventory Report states that law enforcement seized "[t]wo Michigan ID[s] belonging to Mahone and Barnes" from the apartment [*Id*. at 19]. This information reveals that Defendants stored personal items in the apartment. Considering this information collectively, the undersigned finds Defendants had a reasonable expectation of privacy at the apartment.[3]

### B.     Nexus

The Fourth Amendment requires that a search warrant be based on an affidavit containing "particularized facts" that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, probable cause requires a "nexus between the place to be searched and the evidence sought." *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). "The

---

[3]     The Government also indicates that Defendants have standing [*See* Doc. 62 p. 12 (the Government argues that the officers observations of the Defendants traveling two and from the apartment "indicat[es] that Barnes and Mahone resided at that location")].

14

connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances. *Id.* The Court must determine "whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

Defendants contend the affidavit "does not provide sufficient information from which a neutral and detached judge could find a nexus to the residence" [Doc. 56 p. 5]. Defendants argue that none of the alleged drug transactions, which the surveilling officers purportedly observed on June 7 and July 2 and 11, occurred at or near the apartment [*Id.* at 5–6]. Defendants assert that officers recovered contraband from only a single alleged transaction on July 2, 2024, when Suspect 1 engaged in a drug transaction in a parking lot, officers arrested the other participant, and that individual said he purchased heroin from Suspect 1 [*Id.* at 6]. They assert that the affidavit contains no information on the reliability or credibility of this individual [*Id.*]. Defendants argue that on the third date, July 11, 2024, law enforcement did not observe the alleged transaction and did not recover contraband, despite stopping and searching the other vehicle [*Id.*]. As a result, Defendants submit that "[a]t most, the affidavit established a single drug transaction in a parking lot that was some distance from the residence on July 2, 2024" [*Id.*].

In response, the Government contends that the officers observed the suspects leave the apartment, meet up with various unknown individuals for a brief period, and immediately return to the apartment [Doc. 62 p. 8]. It acknowledges that no controlled buys were conducted in this

case [*Id.*]. Focusing on the events of July 2, 2024, the Government submits that while the individual who purportedly bought heroin from Suspect 1 was not a confidential informant, the individual gave "direct evidence" that he purchased one gram of suspected heroin from Suspect 1 and "that for the last six months he had been purchasing approximately one gram of suspected heroin/opiate from numerous individuals using the same phone number" [*Id.* at 9]. The Government argues that officers corroborated the information from the arrested individual because they observed the hand-to-hand transaction between Suspect 1 and the individual [*Id.* at 9–10].

In reply, Defendants contend that "the cooperating individual [from the July 2 transaction] is actually part of the criminal milieu because he was arrested with illegal narcotics in his possession" and that this requires the Court to weigh the individual's reliability, veracity, and basis of knowledge [Doc. 65 p. 4]. At the suppression hearing, defense counsel argued that the individual arrested after the July 2 transaction was a "chronic drug user" who admitted purchasing gram quantities of narcotics daily from multiple individuals over a six-month period. Defendants further asserted that the failure to find contraband in the search of the alleged participants and their vehicle on July 11, 2024, contradicts the affiant's assertions that the officers were observing drug transactions on earlier dates. Defendants contend that the single transaction on July 2 that occurred away from the residence is insufficient to provide a nexus between the residence and drug trafficking.

Circumstantial evidence of an individual leaving a location and soon engaging in a drug sale "suggest[s] that the illicit materials came from the location." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (citations omitted). Similarly, a defendant's "return[] to the location sought to be searched, [following a controlled buy,] create[s] a reasonable inference that the defendant took the proceeds with him." *Id.* (citations omitted). "[A] warrant's validity does not

16

turn on whether it is supported by an 'actual showing' of criminal activity at the targeted location." *Id.* (quoting *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019)). "[I]nstead[, the Court] ask[s] whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *Id.* (quoting *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000)).

Here, surveilling officers observed several suspected drug transactions on three dates. On June 7, Suspect 1 left the apartment, entered a rental vehicle and drove to a Kroger parking lot, where he engaged in a suspected drug transaction and then returned directly to the apartment [Doc. 58-1 ¶ 4]. Also on that day, officers observed Suspect 2, later identified as Barnes, leave the apartment on foot, conduct two separate, brief hand-to-hand transactions with two people also on foot, and return to the apartment after each transaction [*Id.*]. Officers later saw Suspect 2 depart the apartment and begin walking, enter the passenger compartment of a Honda Civic, and exit the Civic one-half mile later at a gas station, where Suspect 1 picked up Suspect 2, who did not enter the gas station, and returned directly to the apartment [*Id.*]. Based upon their training and experience, the surveilling officers believed four drug transactions occurred on June 7, 2024, with the seller leaving from and returning to the apartment after each transaction [*Id.*].

While conducting surveillance on July 2, 2024, officers saw Suspect 2 (Barnes) leave the apartment, drive a rental car to an address on Meadow View Road where he picked up a female, and drive the female to the Kroger across the street [*Id.* ¶ 6]. After this "very brief" interaction with the female, Suspect 2 drove directly back to the apartment [*Id.*]. Officers also followed the female, who went directly to the women's restroom inside the Kroger and did not make any purchases while at the grocery store [*Id.*]. Based upon his training and experience, the affiant believed Suspect 2 had engaged in drug trafficking with the female [*Id.*]. Also on this date,

surveilling officers observed Suspect 1 leave the apartment, drive a second rental vehicle to the Kroger parking lot, engage in a hand-to-hand transaction with a man in a black SUV, and return to the apartment [*Id*. ¶ 7]. "A short time later," an officer observed suspected heroin in plain view in the black SUV, which was still parked in the Kroger parking lot, and arrested the driver, who subsequently admitted that he purchased heroin from Suspect 1 [*Id*.].

Officers again surveilled the apartment on July 11, 2024, the day after they believed the suspects had returned from Detroit, Michigan [*Id*. ¶¶ 9–10]. Officers observed Suspect 1 leave the apartment and drive away in a rental vehicle and followed him as he drove three "heat runs" (circuitous routes taken to avoid surveillance by law enforcement) while in route to a Waffle House on Papermill Road [*Id*. ¶ 11]. Officers observed Suspect 1 engage in a brief conversation with the driver of a brown truck in the Waffle House parking lot and then drive directly back to the apartment [*Id*.]. Officers observed the brown truck leave the Waffle House parking lot, stop for one minute in the parking lot of an adjacent hotel, and then drive away [*Id*.].  Law enforcement stopped and searched the brown truck and its occupants but did not find contraband, although they identified two of the three occupants as drug dealers and users [*Id*.]. Based upon his training and experience, the affiant stated that drug customers will commonly use drugs they purchase immediately or hide them to prevent confiscation by law enforcement [*Id*.].

The affiant relates seven suspected drug transactions over a thirty-eight-day period and in all of these, the suspects left for the transaction from the apartment and returned directly to the apartment afterward. This pattern of activity provides a nexus between the apartment and drug trafficking. *Sanders*, 106 F.4th at 462.

Defendants deny the suspected transactions provide a nexus because law enforcement only found suspected narcotics following one transaction on July 2 [Doc. 56 p. 5]. They acknowledge

that "recent and reliable" evidence of ongoing drug activity at a residence can establish a nexus to the residence [*Id*. (citing *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018))]. Defendants assert, however, that "[w]hen the evidence in the affidavit establishes a single drug transaction or drug activity that is not recent, then nexus has not been established" [Doc. 56 p. 5 (citing *United States v. Reed*, 993 F.3d 441, 448 (6th Cir. 2021))]. They also argue that the evidence from the July 2 transaction is not reliable [Doc. 56 p. 6; Doc. 65 p. 4 (arguing the July 2 "cooperating individual is actually part of the criminal milieu because he was arrested with illegal narcotics in his possession")].

"Evidence that one leaves a 'residence, engage[s] in a drug transaction, and then return[s] into the residence' 'plainly demonstrate[s] a sufficient nexus' with the location." *Sanders*, 106 F.4th at 463 (citations omitted). And a single instance of a defendant leaving a residence, completing a drug transaction, and returning to that residence is sufficient for a finding of probable cause. *United States v. Florence*, 150 F.4th 773, 777–78 & n.1 (6th Cir. 2025) (noting that in *Sanders*, "the officers' observation of [the defendant] leaving his residence, completing *a single* drug transaction, and returning to a residence was enough for the *Sanders* court to find probable cause to search that residence" (citing *Sanders*, 106 F.4th at 463)). Thus, the single confirmed transaction on July 2 is sufficient to establish a nexus to the residence. But this single transaction is only a portion of the evidence supporting nexus. Surveilling officers observed six other trips to and from the apartment that they believed to be drug transactions based upon their training and experience. Additionally, on two of the three dates, Suspect 1 engaged in circuitous driving in order to avoid detection by law enforcement, which further supports that the transactions were drug transactions.

19

Defendants characterize the driver of the SUV's admission that he purchased the heroin from Suspect 1 (whom he identified as the black make driving the white Chevrolet Impala [Doc. 58-1 ¶ 7]) as unreliable. "[W]hen information comes from a confidential informant within the criminal milieu, courts proceed with skepticism, and probable cause may hinge upon evidence of the informant's reliability, veracity, and basis of knowledge. *United States v. Dauksys*, No. 6:25-CR-21, 2025 WL 3482852, at *3 (E.D. Ky. Oct. 20, 2025) (citing *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004)), *report & recommendation adopted by* 2025 WL 3281592 (E.D. Ky. Nov. 25, 2025). Generally, an informant's self-incriminating statements are deemed intrinsically credible. *See United States v. Gamble*, No. 22-5194, 2022 WL 17456308, at *4 (6th Cir. Dec. 6, 2022) ("[T]he driver, in voluntarily speaking with the officers about the drug transaction, made statements against his own penal interest which further indicated his reliability." (citations omitted)); *United States v. Barone*, 584 F.2d 118, 122 (6th Cir. 1978) ("That some of the statements necessarily were against the penal interest of the informant weighs heavily in support of his reliability and is, we have held, a significant and sometimes conclusive, reason for crediting the statements of the informant." (citation omitted)). Information from a person from the criminal milieu, however, may be shorn up by independent law enforcement corroboration. *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (finding that "in the absence of any indicia of the [confidential] informants' reliability, courts insist that the affidavit contain substantial independent police corroboration" (citations omitted)). *Cf. United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (finding probable cause lacking where informant gave statements after police discovered a large amount of drugs in his car, police failed to corroborate any of his statements, and the affidavit contained no information connecting

defendant's residence to the drugs), *overruled on other grounds by DePierre v. United States*, 564 U.S. 70 (2011).

Here, the affiant provides substantial information to corroborate the informant's statements. The affidavit states surveilling officers witnessed Suspect 1 leave the target residence, drive to the Kroger parking, meet the individual in the black SUV, and then drive back to the target location. Only "[a] short time" after Suspect 1 left the Kroger parking lot, a uniformed officer approached the SUV and observed narcotics in plain view. When questioned following his arrest, the individual stated that he bought one gram of heroin from a black male driving a Chevrolet Impala and had often bought narcotics from multiple people using the same cell-phone number. Further, Defendants' argument "assumes the detectives 'conducted a search based on [the] informant's tip alone. But in reality, 'the warrant was based on [the detectives'] own observations more than it was the informant['s].'" *United States v. Sims*, No. 23-4034, 2025 WL 692346, at *5 (6th Cir. Mar. 4, 2025) (quoting *United States v. Jones*, 817 F.3d 489, 492 (6th Cir. 2016)) (first alteration in original). The bulk of the affidavit is not reliant on the information provided by the individual but rather is based on officers' own observations of Defendants' comings and goings from the apartment, as well as their suspicious behavior, and the officers' conclusions based on their training and experience. Further, it can be inferred that the identity of the driver of the SUV was known to law enforcement because he had an outstanding warrant and was taken into custody [Doc. 58-1 ¶ 7], and if his identification of Suspect 1 proved to be false, he could be prosecuted. *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005) (holding that a report from an informant whose identity is known to law enforcement, thus, subjecting the informant to prosecution for making a false report, is "entitled to far greater weight than . . . an anonymous source").

"[T]here is no model fact pattern for establishing a fair probability that contraband will be found" at a given place. *Sanders*, 106 F.4th at 462. "Instead, the officers just [have] to show a connection between the place to be searched and the illicit activity." *Higgins*, 141 F.4th at 816 (citation omitted). Here, the affiant's information that two black males left the apartment, engaged in seven suspected drug transactions, and directly returned to the apartment provides a substantial basis for the issuing judge to believe that the apartment will contain evidence of drug trafficking. The undersigned therefore finds that Detective Strickenberger's affidavit establishes a nexus between the apartment and drug trafficking.

### C.      Staleness

Defendants assert that the information in the affidavit is stale, because "[t]he limited information in the affidavit linking drug trafficking to the residence is almost exclusively based on information gained through surveillance thirty-four (34) days prior to the execution of the search warrant" [Doc. 56 p. 7]. Defendants submit that "[t]he affidavit fails to establish when the criminal activity began" and the "only evidence of what could arguably be an actual drug transaction is from the July 2, 2024 incident in the parking lot" [*Id.* at 8].

Assessing whether an affidavit's information is stale requires a case-by-case analysis. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (citing *Sgro v. United States*, 287 U.S. 206, 210–11 (1932)). Under this analysis, "the length of time between the events listed in the affidavit and the application for the warrant [is] salient" but not dispositive. *Id.* When considering whether information presented in support of a request for the issuance of a search warrant is stale, the Court considers: "(1) the character of the crime[, whether it is] a chance encounter . . . or a regenerating conspiracy[], (2) the criminal[, whether he is] nomadic or entrenched[], (3) the thing to be seized[, whether it is] perishable and easily transferable or of

enduring utility to its holder[], and (4) the place to be searched [whether it is a] mere criminal forum of convenience or secure operational base[]." *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (citing *United States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir. 2006)).

Analysis of these four factors reveals the information in Detective Strickenberger's affidavit was not stale. As a preliminary matter, the last suspected drug transaction described in the affidavit occurred on July 11, 2024, one day before the search warrant was issued on July 12, 2024. Defendants assert that information in the affidavit "linking drug trafficking to the residence is almost exclusively based on information gained through surveillance thirty-four (34) days prior to the execution of the search warrant" on July 12, 2024 [Doc. 56 p. 7]. Not so. As discussed above, the affidavit outlines a series of seven suspected drug transactions between June 7 and July 11, 2024.

"Evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (citation omitted) (finding that a twenty-three-month-old controlled drug buy from ongoing enterprise was not stale); *see also United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017) (three-week-old drug buy not stale); *United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) (fifteen-day-old information about drug trafficking not stale); *United States v. Thomas*, 605 F.3d 300, 309–10 (6th Cir. 2010) (eight-month-old information about drug manufacturing not stale); *United States v. Hammond*, 351 F.3d 765, 771–72 (6th Cir. 2003) (five-month-old information about drug manufacturing not stale); *Spikes*, 158 F.3d at 924 (finding that four-year-old evidence coupled with recent surveillance was not stale when there was ongoing drug trafficking).

Defendants argue that evidence of a single drug transaction (the July 2 transaction) does not establish ongoing drug activity [Doc. 56 p. 8 (citing *Reed*, 993 F.3d at 449)]. At the suppression

23

hearing, Defendants highlighted that the affidavit does not allege that they had a history of drug or convictions, nor prior involvement with law enforcement. But the Court judges the sufficiency of an affidavit based upon what it contains, rather than what it lacks. *Sanders*, 106 F.4th at 463. Here, the affidavit describes that in early May 2024, law enforcement learned that rental cars linked to Khalid Sullivan, an individual who sold heroin in a controlled buy on April 24, 2024, were repeatedly located in the parking lot of the Holston Place Apartments. Surveilling officers then observed repeated drug sales by Suspects 1 and 2 on June 7, July 2, and July 11, and four involved rental cars. The activity described in the affidavit is not a "chance encounter" but, instead, the affidavit describes an ongoing drug conspiracy.

The seven suspected drug transactions in the affidavit all involve the suspects leaving the apartment, traveling to and conducting the transaction, and then returning directly to the apartment. This information shows the suspects are operating out of the apartment, which is their operational base. Defendants argue that the suspects were nomadic because they traveled to Detroit while under surveillance [Doc. 56 p. 8]. Comparing the case to the facts and circumstances in *United States v. Scales*, No. 3:22-CR-20, 2024 WL 841191 (E.D. Tenn. 2024),[4] Defendants alleged at the hearing that it was clear from the affidavit that this was a nomadic endeavor, as Defendants were believed to be in Detroit, Michigan for approximately five days, and there was a number of times that there was no activity at the apartment. Defendants further note that "[b]y their very nature, drugs are easily transferable and quickly sold and consumed" [*Id.*]. Defendants contend that the apartment was not a secure operational base, as there were no transactions linked to the apartment, nor any tips regarding evidence to be found at the apartment.

---

[4] The undersigned notes that since the hearing, the Court of Appeals for the Sixth Circuit affirmed this decision. *See United States v. Scales*, No. 24-5905, 2025 WL 2042202 (6th Cir. July 21, 2025).

Considering as it must the totality of the circumstances, the undersigned concludes that the affidavit alleges a regenerating conspiracy, as surveilling officers on several occasions saw Defendants leave the apartment, conduct what appeared to be a hand-to-hand drug transaction, and then return to the apartment immediately thereafter. That, combined with the officers' extensive experience in narcotics, and with the events of July 2, 2024, where an officer observed drugs in plain view and the purchaser identified Suspect 1 as the person who sold heroin to him, supports a finding that the suspects were operating out of the apartment, where they stored drugs and proceeds. Defendants repeated behavior of coming from and returning to the same location after the various transactions indicates a more entrenched situation. Finally, while drugs by their nature are easily perishable and transferable, the undersigned finds that the evidence, including a suspected transaction the day before the search warrant issued, shows the information provided in the affidavit was not stale.

### D.      Good Faith

"[J]udicial suppression is inappropriate when an officer conducts a search in 'objectively reasonable reliance' on a warrant later deemed to be invalid." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)); *see also United States v. Herring*, 555 U.S. 135, 141–42 (2009) (rejecting automatic exclusion of evidence and, instead, asking whether exclusion will provide "appreciable deterrence"). This is because "[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *United States v. White*, 874 F.3d 490, 505–06 (6th Cir. 2017) (quoting *Leon*, 468 U.S. at 921); *see also Neal*, 106 F.4th at 572 (observing that when the affidavit lacks probable cause, "the authorizing judge—not the officer—is the blameworthy party").

The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. "Some modicum of evidence, however slight[,] between the criminal activity at issue and the place to be searched" will support an officer's good-faith belief in the existence of probable cause. *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quoting *White*, 874 F.3d at 496). Thus, only when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" will the search fall outside the good-faith exception and the evidence be suppressed. *Neal*, 106 F.4th at 572 (quoting *Leon*, 468 U.S. at 923).

Here, the warrant for the search of unit 1 of the Holston Place Apartments was based upon probable cause that evidence of drug trafficking would be found at the location. But even if probable cause was lacking, the evidence seized in the search of the apartment should not be suppressed because the executing officers relied on the search warrant in good faith.

Defendants allege *Leon*'s bare-bones affidavit exception applies. *Leon*, 468 U.S. at 923. Defendants assert that the affidavit shows only a single confirmed drug transaction [Doc. 65 p. 4]. They contend that this transaction is based upon unverified information by an informant of unsubstantiated reliability [*Id*. at 5]. Defendants liken this case to *United States v. Helton*, 314 F.3d 812, 825 (6th Cir. 2003), where the Court found that no reasonable officer would have believed the affidavit provided probable cause when it failed to show that the informant was trustworthy and reliable [Doc. 65 p. 5]. Finally, they maintain that the affidavit lacks any "relevant independent investigation" by law enforcement [*Id*.].

Detective Strickenberger's eight-page affidavit provided the executing officers with evidence of a connection between the apartment and drug trafficking. Officers conducted

surveillance at the apartment complex on at least seven days between June 6, 2024, and July 11, 2024. The surveilling officers witnessed on seven occasions Defendants leaving the apartment, traveling to a location away from the apartment, conducting what appeared to be a hand-to-hand drug transaction based on the officer's training and experience, and then returning to the apartment. Further, following the suspected drug transaction on July 2, 2024, an officer saw drugs in plain-view in the vehicle and arrested the driver who said he purchased the drugs from the individual whom the officers were surveilling. While the affidavit contains no information on the individual's credibility, the information from the arrested individual is corroborated by the officers' real-time observations of the drug sale itself and the seller's leaving and returning to this apartment following the transaction. Accordingly, this is not a case where the affidavit is "completely devoid of any nexus between" the illegal activity and the place to be searched or the item to be seized, *Carpenter*, 360 F.3d at 595–96, nor does it "nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied," *Sanders*, 106 F.4th at 469 (citations omitted). Finally, the facts here are inapposite to the circumstances in *Helton*, where the statements "were not corroborated in any meaningful manner." *Helton*, 314 F.3d at 824.

These connections between drug activity and the apartment provide at least a "minimally sufficient nexus" to support the executing officers' good faith reliance on the search warrants. *Accord Neal*, 106 F.4th at 573 (affirming application of the good-faith exception when the affidavit demonstrated defendant lived at the residence, was recently dealing a large quantity of drugs per a reliable confidential informant and engaged in a single controlled buy). Thus, if Detective Strickenberger's affidavit is found to be deficient in establishing a probable cause, then the evidence seized in the execution of the search warrant still should not be suppressed.

# III.    CONCLUSION

For the reasons discussed herein, the undersigned finds as follows:

(1)    Defendants have standing to challenge the search of the apartment;

(2)    the affidavit provides probable cause for a search warrant, including a nexus between the apartment and criminal activity and fresh information of drug trafficking; and

(3)    officers searched the apartment in good faith reliance on the search warrant.

The undersigned therefore **RECOMMENDS**[5] that the District Judge **GRANT** Defendant Mahone's Motion to Adopt Motion to Suppress Evidence Seized at 5101 Asheville Highway Unit 101 [Doc. 59] and **DENY** the Motion to Suppress [Doc. 56].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).

28