UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )                                     3:24-CR-79-KAC-JEM
)
CORNELIUS BARNES, JR., and )
MICHAEL ALEXANDER MAHONE; )
)
Defendants. )

## <u>ORDER</u>

This action is before the Court on (1) United States Magistrate Judge Jill E. McCook's

Report and Recommendation ("Report") [Doc. 89], recommending that the undersigned (a) grant

Defendant Michael Alexander Mahone's Motion to Adopt Defendant Cornelius Barnes, Jr.'s

Motion to Suppress [Doc. 59] and (b) deny Defendant Barnes's Motion to Suppress [Doc. 56]; and

(2) Defendants' objections to that Report [Docs. 93, 94].  As set forth below, the Court **ADOPTS**

relevant portions of the Report [Doc. 89], **GRANTS** the Motion to Adopt [Doc. 59],

**OVERRULES** the Objections [Doc. 93, 94], and **DENIES** the Motion to Suppress [Doc. 56].

## I.      <u>Background</u>[1]

On July 12, 2024, law enforcement applied for; and the Honorable Hector Sanchez, Knox

County Criminal Court Judge issued; a warrant to search the residence at "5101 Asheville

Highway, apartment unit 1, Knoxville," Tennessee ("Unit 1") [*See* Docs.  58-1 at 9-13].  Unit 1 is

---

[1] No Defendant raises any specific salient objection to the Report's factual findings [*See* Docs. 93,
94].  So, the Court generally adopts the findings with slight modifications herein and summarizes
the key relevant facts.  *See* 28 U.S.C. § 636.

in an apartment complex located at 5101 Asheville Highway in Knoxville, Tennessee (the "Apartment Complex") [*Id.*].

A law enforcement officer signed an affidavit in support of the warrant [*See* Doc. 58-1 at 1-8]. That Affidavit provided that on April 24, 2024, law enforcement utilized a confidential informant to conduct a controlled purchase "of a quantity of heroin/opiate" from Khalid Sullivan [*See* Doc. 58-1 ¶ 3]. "During the controlled purchase," law enforcement observed Sullivan driving a white Dodge Durango [*Id.*]. That same vehicle was parked at the Apartment Complex on May 5, and law enforcement determined that it was a rental vehicle [*Id.*]. On May 8, the white Dodge Durango was replaced with another rental vehicle.

On June 6, law enforcement officers were surveilling the Apartment Complex and saw Sullivan operating a silver Chevrolet Impala registered to him [*Id.*]. At that point, law enforcement thought that Sullivan may have borrowed the white Dodge Durango from a friend or neighbor [*Id.*].

By June 6, someone parking in the Apartment Complex had replaced the second rental vehicle with a third rental vehicle—a white Dodge Hornet [*Id.*]. This "activity drew the attention of law enforcement to who was actually using the rental vehicles" [*Id.*]. "[F]rom training and experience," the affiant-officer "kn[ew]" "that narcotics traffickers" "commonly utilize rental vehicles and trade them out often in attempts to thwart law enforcement detection" [*Id.*].

Law enforcement began to "conduct[] surveillance on the activity between the white Dodge Hornet" and Sullivan's "silver Chevrolet Impala" [*Id.* ¶ 4]. Officers suspected that the Apartment Complex "was a base" for drug trafficking [*Id.*].

On June 7, while surveilling the Apartment Complex, officers saw two men exit Unit 1 [*See* Docs. 58-1 ¶¶ 4, 8; 62 at 2]. Those men were later identified as Defendants Mahone

and Barnes [*See* Doc. 62 at 2].  Knowing what we know now, "Suspect 1" in the Affidavit is Defendant Mahone and "Suspect 2" is Defendant Barnes.

On June 7, Defendant Mahone entered the white Dodge Hornet and left the Apartment Complex [*Id.* ¶ 4].  He drove to a Kroger parking lot where officers observed him engage in "what they know from training and experience to be an obvious hand-to-hand drug transaction" [*Id.*].  After the transaction was complete, Defendant Mahone "immediately" returned to Unit 1 [*Id.*].

A "short time later," Defendant Mahone again left Unit 1 and entered the white Dodge Hornet [*Id.*].  He "ma[de] numerous unnecessary turns, and t[ook] numerous circuitous routes" "consistent with" attempting to "elude law enforcement detection" [*Id.*].

A "short time" after Defendant Mahone left Unit 1, Defendant Barnes left Unit 1 on foot "and conducted two separate hand-to-hand transactions with other unknown individuals who were also on foot" [*Id.*].  "[A]fter each interaction," Defendant Barnes returned to Unit 1, "indicating" to the officer that Defendant Barnes was "resupplying each time he returned" [*Id.*].

At one point that day, Defendant Barnes "walked away" from the Apartment Complex and entered the "passenger seat of a white Honda Civic" [*Id.*].  The vehicle traveled half a mile to a Circle K gas station [*Id.*].  Defendant Barnes did not enter the store at the Circle K [*Id.*].  And he "walked further to meet the white Honda Civic than the distance to walk" straight from the Apartment Complex to the Circle K [*Id.*].  "[F]rom training and experience," the affiant-officer knew that Defendant Barnes "likely met with the occupant of the white Honda Civic to conduct a drug transaction" [*Id.*].  Defendant Mahone met Defendant Barnes at the Circle K [*Id.*].  And they traveled from the Circle K in the white Dodge Hornet back to Unit 1 [*Id.*].

On July 1, the affiant-officer noticed that there were "two new rental vehicles" in the parking spots at the Apartment Complex Defendants Barnes and Mahone typically used [*Id.* ¶ 5].

3

Defendant Barnes entered and exited a rental black Chrysler Pacifica, and Defendant Mahone entered and exited a rental black Chevrolet Impala [*Id.*].

On July 2, Defendant Barnes left Unit 1 in a rental vehicle, picked up an unknown woman, and drove her directly across the street to a Kroger grocery store parking lot [*Id.* ¶ 6]. "The female exited the suspect vehicle and walked directly to the woman's restroom" [*Id.*]. She made no purchase while in the grocery store, and she left quickly [*Id.*]. Defendant Barnes "returned directly" to Unit 1 "after the very brief interaction with the unknown female" [*Id.*].

Based on the affiant-officer's "training and experience," this "type of behavior" is "indicative of drug trafficking" [*Id.*]. And the fact that Defendant Barnes "consistently" returned to Unit 1 in between suspected drug transactions showed that he was "stor[ing]" "the illegal substance" at Unit 1 and returning to Unit 1 "to resupply" [*Id.*].

That same day, officers saw Defendant Mahone leave Unit 1 in a rental vehicle and drive to the same Kroger parking lot [*Id.* ¶ 7]. There, he "conduct[ed] a hand-to-hand transaction with a male in a black SUV" [*Id.*]. "Immediately following," Defendant Mahone retuned to Unit 1 [*Id.*].

Law enforcement "approached the individual in the black SUV" while he was "still parked in the" Kroger parking lot [*Id.*]. "In plain view, the officer noticed what he knew from training and experience to be a small quantity of heroin" [*Id.*]. Law enforcement later tested the substance and determined that it was a "heroin/opiate narcotic" [*Id.*]. Law enforcement arrested the individual in the SUV on an outstanding warrant [*Id.*]. The individual "admitted" to purchasing "1 gram of suspected heroin/opiate" from Defendant Mahone that day [*Id.*].

According to the Affidavit, the affiant-officer also learned that the Knox County Sheriff Office (KCSO) Narcotic Unit had "conducted a traffic stop" on Defendant Barnes on January 10, 2024 [*Id.* ¶ 8]. At the time of the stop, Defendant Barnes possessed "a large sum of currency with

4

no reasonable explanation of how it was acquired" [*Id.*].  Defendant Barnes told KCSO that he was "on his way back to Detroit, MI" [*Id.*].

On July 5, both of the rental cars used by Defendant Mahone and Barnes were in Detroit, Michigan [*Id.* ¶ 9].  By July 11, the Chrysler Pacifica had "returned to the Knoxville area" [*Id.* ¶ 10].  And it "was parked in the parking lot" of the Apartment Complex [*Id.*].

Later the morning of July 11, law enforcement saw Defendants exit the Chrysler Pacifica and enter Unit 1 [*Id.* ¶ 11].  "Moments later," officers observed Defendant Mahone leave Unit 1 in the Chrysler Pacifica [*Id.*].  He "was gone only a few minutes before returning" [*Id.*].

"A short time later," Defendant Mahone left Unit 1 again in the Chrysler Pacifica [*Id.*].  He made "no less than three 'heat runs'"—"routes to confuse or throw off law enforcement surveillance" [*Id.*].  Eventually, he entered the parking lot of a Waffle House in West Knoxville [*Id.*].  He entered the restaurant but returned to the Chrysler Pacifica quickly [*Id.*].

Then, "a brown pickup truck with three occupants back[ed] in next to" Defendant Mahone [*Id.*].  Defendant Mahone "open[ed] his [vehicle] door and engaged in a short, very brief interaction with the driver of the brown pick up" [*Id.*].  Afterward, Defendant Mahone quickly left the Waffle House parking lot and drove "directly back to" Unit 1 [*Id.*].  The officer's "belief through training and experience [was] that it is more likely than not[] that the two engaged in a drug transaction" [*Id.*].

The pickup also quickly left the parking lot, "only to pull into an adjacent hotel parking lot for approximately one minute" [*Id.*].  The affiant-officer "kn[ew] from training and experience that drug purchase customers will commonly immediately use the drugs that they just purchased or stow/hide their recently purchased contraband" [*Id.*].  Officers then stopped the pickup and questioned the occupants [*Id.* ¶ 12].  No occupant mentioned "just being in the parking lot of the

5

Waffle House or having any interaction" with Defendant Mahone [*Id.*]. Officers did not find any contraband in the pickup, but a records check revealed that two of the three occupants were "either drug abusers or drug dealers" [*Id.* ¶¶ 12-13].

The Affidavit represented that Unit 1 was "occupied by or under the control of" Defendant Barnes [*See* Doc. 58-1 at 9]. The affiant-officer's "training and experience" showed that individuals "involved in the storage, use, sale, delivery, or exchange of controlled substances, commonly keep and maintain, especially within their residences," "items that they use to conduct or facilitate those activities" [*Id.* ¶ 2]. So, the officer believed that a search of Unit 1 would uncover evidence of drug possession, drug distribution, and possession of drug paraphernalia [*See id.* at 8].

The officer was right. After the warrant issued, law enforcement searched Unit 1 on July 12, 2024. The search yielded "approximately 750 grams of methamphetamine, 474 grams of fentanyl, two loaded handguns, $5,047 U.S. Currency, six cellular telephones, and various items used to manufacture and distribute narcotics, including plastic baggies, a kilogram press, electronic scales, and cutting agents commonly used to dilute narcotics" [*See* Docs. 62 at 5, 58-1 at 16-19].

Defendant Barnes filed a motion to suppress "all evidence seized pursuant to a search of Mr. Barnes' residence," Unit 1 [Doc. 56 at 1]. Defendant Mahone filed a one-page motion asking to "adopt" Defendant Barnes's Motion [*See* Doc. 59]. Defendant Mahone asserts that he "was an overnight guest at the residence of Cornelius Barnes Jr." at Unit 1 and accordingly had "standing to join the motion to suppress" [Doc. 59 (citation omitted)].

After a hearing on the Motions, Judge McCook issued the Report [Doc. 89]. The Report recommends that the undersigned (1) grant Defendant Mahone's Motion to Adopt and (2) deny the Motion to Suppress [*See* Doc. 89 at 28]. As relevant to the Objections here, the Report specifically concluded that (1) the Affidavit established probable cause to search Unit 1, (2) the

6

information in the Affidavit was not stale, and (3) even if probable cause were lacking, "the executing officers relied on the search warrant in good faith" [*See id.* at 22, 25, 27].

Defendants filed three objections. First, Defendants argue that the Report erred in concluding that the Affidavit established probable cause because there was no "nexus between" Unit 1 "and the alleged drug trafficking" [*See* Docs. 93 at 2, 94 at 3]. Second, Defendants argue that the information in the Affidavit was stale at the time the warrant issued [*Id.*]. Third, Defendants argue that the "good faith exception" does not apply [*See* Docs. 93 at 2, 94 at 3-4].

The United States opposed Defendants' Objections [*See* Doc. 95].

## II.    <u>Analysis</u>

Under 28 U.S.C. § 636(b)(1), the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." The Court considers timely objections de novo. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim P. 59(b)(3).

Starting with Defendants' probable cause objection, "[p]robable cause is 'not a difficult standard to meet.'" *United States v. Florence*, 150 F.4th 773, 777 (6th Cir. 2025) (quoting *United States v. Whitlow*, 134 F.4th 914, 919 (6th Cir. 2025)). "The critical question is whether there was a 'fair probability' that the officers would find evidence of criminal wrongdoing in the location to be searched." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). And the affidavit in support of the search warrant "had to establish 'a nexus between the place to be searched and the evidence sought.'" *Id.* (quoting *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011)).

A reviewing judge affords "'great deference' to the issuing judge's" probable cause determination. *United States v. Long*, 155 F.4th 829, 834 (6th Cir. 2025) (quoting *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc)). The reviewing court's role is "'simply to ensure'" that the issuing judge "'had a substantial basis for concluding that probable cause

existed' when he issued the warrant." *Florence*, 150 F.4th at 777 (quoting *Gates*, 462 U.S. at 238-39). With limited exception not applicable here, the Court reviews the facts in the affidavit in support of the warrant, not what could have been included. *See United States v. McCarley-Connin*, 148 F.4th 808, 815-16 (6th Cir. 2025).

In *United States v. Sanders*, the United States Court of Appeals for the Sixth Circuit sitting en banc explained that when a search warrant affidavit "adequately establishes both where a defendant resides as well as the defendant's active engagement in" drug dealing, "an inference can reasonably be made (especially when aided by an affiant-officer's experience) that the criminal suspect keeps the instrumentalities and fruits of his crime in his residence." *Sanders*, 106 F.4th at 462 (cleaned up). *United States v. Simmons* continued along that path, confirming that "even if no direct evidence ties drug dealing to a home, a nexus exists based on circumstantial evidence if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *See* 129 F.4th 382, 387 (6th Cir. 2025) (cleaned up).

Here, the facts within the four corners of the Affidavit established a nexus between Unit 1 and drug trafficking. ***First***, *Sanders*, *Simmons*, and Defendant Barnes's actions alone likely doom Defendants' objection. The Affidavit sufficiently established that Unit 1 was Defendant Barnes's residence [*See, e.g.*, Doc. 58-1 at 1]. This is true even if he may have traveled to Detroit for a few days while under surveillance [*See id.* ¶ 9]. And the facts in the Affidavit, explained through the lens of the affiant-officer's training and experience, were sufficient to establish that Defendant Barnes was actively engaged in drug trafficking. *See Simmons*, 129 F.4th at 387 ("An affidavit can . . . show ongoing drug activity through the repeated nature of the transactions," "independent surveillance," or "witness accounts corroborated by an affiant's experience and training" (cleaned up)). In June and July 2024, Law enforcement watched Defendant Barnes participate in multiple

8

transactions that experience and training indicated were hand-to-hand sales or indicative of drug trafficking [*See* Doc. 58-1 ¶¶ 4, 6]. Law enforcement did not have to conduct the transactions themselves or through proxies to show that Defendant was engaged in drug trafficking.

***Second***, even if Defendant Barnes's actions alone were not sufficient to establish a nexus, the remainder of the facts in the Affidavit fill any gap. Over two months, law enforcement observed Defendants Barnes and Mahone leave Unit 1, engage in both suspected drug transactions and one confirmed drug transaction, and then return to Unit 1 promptly after these transactions [*See* Doc. 58-1 at 4-8]. Rather than relying on "generalized assertions," [*see* Doc. 93 at 10], the Affidavit established both the affiant-officer's relevant training and experience and his reasonable bases for concluding that the suspected drug transactions were in fact drug transactions, [*see* Doc. 58-1 ¶¶ 1, 4, 6]. And the one confirmed drug transaction on July 2 was confirmed in multiple ways: through law enforcement's observation of the actual "hand-to-hand transaction," the presence of narcotics in the purchaser's vehicle shortly after the hand-to-hand transaction, and the purchaser's admission [*See id.* ¶ 7]. Law enforcement did not rely solely on the word of an uncorroborated informant—an officer saw the hand-to-hand transaction and narcotics purchased with his or her own eyes. For good measure, the affiant-officer confirmed, based on his training and experience, that Defendants' pattern of "leaving and returning" to Unit 1 showed that Defendants were using Unit 1 to "resupply" between drug transactions [*Id.* at ¶ 6]. And the affiant-officer stated that based on his training and experience, illegal substances were likely "being stored" in Unit 1 [*Id.*]. This was enough to establish a nexus between Unit 1 and the evidence of drug trafficking sought.

Moving to Defendants' second objection, the information in the Affidavit was not stale. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." *See United*

9

*States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). Here, officers observed Defendants engage in suspected and actual drug trafficking across two months [*See* Doc. 58-1 at 4-8]. And on July 11—just one day before the warrant issued—officers observed Defendant Mahone travel evasively before engaging in suspected drug trafficking, starting at Unit 1 and returning to Unit 1 [*See* Doc. 58-1 ¶ 11]. Considering the circumstances, the fact that officers did not find actual narcotics in the pickup of the suspected purchasers is not dispositive. The suspected purchasers made a pit stop at a hotel parking lot before officers approached them, and the affiant-officer explained that based on his training and experience, "drug purchase customers will commonly immediately use the drugs that they just purchased or stow/hide their recently purchased contraband" [*Id.* ¶ 11]. And even if the July 11 actions were not enough, the confirmed hand-to-hand drug trafficking on July 2 coupled with Defendants' actions thereafter precludes the information in the Affidavit from being stale [*See* Doc. 58-1 ¶¶ 7, 11]. *See United States v. Tisdale*, 980 F.3d 1089, 1094 (6th Cir. 2020) (concluding that even one month is "not enough time for information to go stale" when there is an "ongoing" conspiracy and "ample evidence of drug trafficking connected to the [searched] address"); *United States v. Perry*, 864 F.3d 412, 415 (6th Cir. 2017) (reasoning that "drug sales two to fifty-one days before" a warrant issued were "recent enough" to avoid staleness there).

Finally, even if probable cause were lacking, the good faith exception would apply. Under the good faith exception, "suppression is not an available remedy when officers conduct a search in good faith reliance on a judicially authorized warrant." *Sanders*, 106 F.4th at 468 (citing *United States v. Leon*, 468 U.S. 897, 909, 922 (1984)). Defendants argue that the Affidavit was "bare bones," an exception to the good faith exception [*See* Docs. 93 at 14, 94 at 10]. A bare bones affidavit is one that is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Sanders*, 106 F.4th at 468 (quoting *Leon*, 468 U.S. at 923). That

10

"moniker" is generally "reserved" for an affidavit that is "either completely devoid of any nexus between the illegal activity and the place to be searched" or "merely state[s] suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* (cleaned up).

The Affidavit was not bare bones. The Affidavit connected both suspected and confirmed drug trafficking to Defendants' start at and prompt return to Unit 1 [*See* Doc. 58-1 ¶¶ 4, 6, 7, 11]. "Evidence that one leaves a residence, engages in a drug transaction, and then returns to the residence plainly demonstrates a sufficient nexus with the location." *Sanders*, 106 F.4th at 463 (cleaned up). And the Affidavit reasonably explained how the affiant-officer's experience and training led him to (1) identify the suspected drug trafficking and (2) believe that evidence of drug trafficking would be found at Unit 1 [*See id.* ¶¶ 2, 4, 6, 11]. So, law enforcement justifiably relied on the judicially-authorized warrant. And even if the Affidavit lacked probable cause, the good faith exception would apply.

## III.    Conclusion

As stated above, the Court **ADOPTS** relevant portions of the Report [Doc. 89], **GRANTS** Defendant Mahone's Motion to Adopt [Doc. 59], **OVERRULES** Defendants' objections to the Report [Doc. 93, 94], and **DENIES** the Motion to Suppress [Doc. 56].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

11